IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **William J. Kelly** ) | |
| ) | |
| Plaintiff ) | No. |
| ) | |
| and ) | |
| ) | Judge: |
| **Lori Lightfoot as Mayor of the City of Chicago and David Brown as Superintendent of Police of the City of Chicago** ) ) ) ) | |
| ) | Magistrate: |
| ) | |
| Defendants ) | |
| ) | |

# MEMORADUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

NOW COMES, Plaintiff William J. Kelly, by and through his attorney Laura Grochocki, and submits this Memorandum in Support of his Motion for Temporary Restraining Order and Preliminary Injunction against Lori Lightfoot, as Mayor of Chicago, and David Brown as Superintendent of Police of the City of Chicago as follows:

## INTRODUCTION

The First Amendment prevents a government official from selectively targeting particular journalists for exclusion from the press corps based on their coverage or the content of their editorial speech. In this case, Mayor Lori Lightfoot ("Lightfoot") and Superintendent of Policer David Brown ("Brown") have banned journalist William Kelly ("Kelly") from continuing to participate in press conferences open to other journalists based on his speech and reporting. Kelly is entitled to a temporary restraining order and preliminary injunction preventing Lightfoot and Brown from prohibiting Kelly from participating in press conferences

based on his First Amendment rights. *See e.g., American Broadcasting Cos. v. Cuomo*, 570 F.2d 1080 (2nd Cir. 1977) (granting TRO in an oral ruling from the bench restoring ABC access); *Karem v. Trump*, 404 F. Supp. 3d 203, 218 (D.D.C. 2019) (granting preliminary injunction restoring press pass of magazine reporter); *CNN v. Trump*, No. 1:18-cv-02610-TJK, Dkt. 20 TRO Hearing (D.D.C.)[1] (granting TRO restoring the press pass of cable news reporter).

## FACTS[2]

William J. Kelly is a veteran Emmy award-winning broadcaster with a well-earned reputation for asking the tough questions of elected officials and decision-makers in Chicago and Illinois. He is currently a paid contributing reporter for the Daily Mail and New York Post. Kelly spent over a decade as a credentialed journalist and his news content has been published on various local and national news outlets such as Tucker Carlson Tonight, FOX News, Forbes, Yahoo, MSN, New York Post. Washington Examiner, Daily Caller, Townhall.com, and the Independent. He spent five years as the mid-day and evening radio host on AM 1590 WCGO, where he presented news, political commentary, and insight to his listeners across the Chicago area. He also makes and breaks news on his social media platforms which are then picked up and broadcast on thousands of blogs, radio show websites and social media pages.

Lori Lightfoot is the Mayor of Chicago Illinois. She regularly holds press conferences to answer questions from news media and has done so with more frequency as her re-election campaign was announced. Lightfoot has a dedicated security detail of more than 70 Chicago Police officers plus 20 private security bodyguards, and she surrounds herself with security

---

1. Transcript available online at https://en.wikipedia.org/wiki/File:CNN_v._Trump_transcript_2018-11-16.pdf
2. See Supporting Affidavit of William Kelly.

officers at her press conferences, using them to intimidate and bully Kelly and anyone else who may ask hard or unpleasant questions, or otherwise express a dissenting view.

Kelly has been a regular and active participant in the Lightfoot's COVID-19 press conferences. During these press conferences, he has several times asked probing questions about Lightfoot's policies especially about the record increases in violent crime in Chicago, the demonization of law enforcement, and the problems this causes.

For instance, at the April 20, 2022 press conference Kelly asked Lightfoot the following: "Mayor Lightfoot, every time you have a press conference, you say crime is down. The economy is booming…" Lightfoot then stated: "Well, that's not true. But get to your question, sir." Kelly continued: "Across the street, we had a police officer on duty, the victim of a hit and run. We have Michigan Avenue the Magnificent Mile now referred to as the mile of fear. The Water Tower Place has thrown the keys back to the lender, they say they don't want to be in Chicago anymore. Real Chicagoans are asking me how you could possibly even consider running for re-election as mayor of the city of Chicago after all the harm you've caused?" Lightfoot responded: "I disagree with you fundamentally. And I don't think I need to address any and dignify your comments. One second further. Next question." Lightfoot visibly upset and was shaking with rage at Kelly.

At her May 25, 2022 press conference, Lightfoot had a meltdown in response to a question by Kelly and threatened to have Kelly escorted out by the police when he attempted to ask Lightfoot a question. It started with Kelly asked Lightfoot the following: "Will you recall, resend your violent tweet, to call to arms? Lightfoot answered a acting as if she was talking to some third person, "The more stupid he sounds." Kelly then asked again: "Will you rescind your call to arms tweet in the light of the mass shooting in downtown Chicago. So as stupid as you think that may be?" In response Lightfoot stated, sometimes yelling: "So let me just let me just do construct the

[3]

series of lies that you just spewed as you do every time you come to one of my press conferences…. So you, you you, you're gonna let me speak sir. You're not going to talk over me. That's not the rules here in this press conference. And if you don't want to abide by those rules, you can take your nonsense someplace else, because I am about follow up with you. I'm not finished. Let me just finish and the nonsense that you're spewing that tourists aren't coming to our city. All you have to do is walk up and down Michigan Avenue. No, sir. **No,** sir. No, sir, you will stop speaking. You will stop speaking. **You're you're, you're full of crap. And that's the nicest thing that I can say. I will not let you spoil this moment. I will not let you if you do not If you do not stop. Harold. Harold, if you do not stop you will be I will ask you to leave and I will make sure that the police take you out of here**. You will not act like this, sir. You can talk and say whatever you want on the street, but in here in my press conference, you will not act like that, sir. And let me be clear with you. I'm not patting myself on the back. I'm not doing a victory lap. What I'm saying is that after 30 years of futility, the men and women of this city will have good paying jobs that they can build a future on. What I'm also saying is that the taxpayers of the city will not have to be called upon again to shore up our police and fire pension. Now you don't want to hear the facts because you can't handle the truth sir, but that is the truth. Next reporter." Afterward, Lightfoot's press secretary Cesar calls Kelly a "fucking animal" on video.

      At Lightfoot's July 19, 2022 press conference, when Kelly attempted to ask a question Lightfoot told Kelly to wait his turn to ask a question and she then continued to speak with other reporters. She said: "Sir, just a moment. I'm talking and you haven't been called on, you know the rules, you'll get called on when it's your turn. Thank you." A few moments later Lightfoot abruptly ended the press conference without letting Kelly ask any questions and she walked off.  Kelly attempted to follows her to ask his question reminding Lightfoot that she had promised to call on

[4]

him for a question and shouting out his question as they went. When Kelly was about 20 feet away from Lightfoot her security guard repeatedly grabbed Kelly to prevent him from asking his question. At no time did Kelly bump or otherwise cause himself to come into physical contact with any of Lightfoot's security guards. Kelly videotaped the entire episode.

On July 20, 2022 at around 3:00 p.m. Kelly went to attend Lightfoot's press conference which was scheduled for that time at City Hall. When he attempted to gain entry by showing his press credentials Kelly was turned away despite having valid press credentials which were recently renewed by the Chicago Police Departments Office of News Affairs. Kelly was accused by an officer in Lightfoot's security detail of having expired credentials or doctoring the credentials. Kelly's Chicago press credentials had an expiration date of June 2024 sticker on it, which was placed there by the Chicago Police Department's Office of News Affairs. Nobody attempted to check with the Chicago Police Department's Office of News Affairs to see if Kelly's credentials were valid, and they just refused him entry into the press conference. The entire episode was videotaped by Kelly.

On August 3, 2022 an attorney sent a letter to the City of Chicago on Kelly's behalf inquiring why Kelly was denied access to Lightfoot's press conference on July 20, 2022, even though Kelly had valid City of Chicago press credentials.

On August 8, 2022 Kelly received a letter from Defendant Brown ("Brown") which revoked Kelly's media credentials falsely saying that Kelly had committed a battery by bumping a security officer at Lightfoot's July 19, 2022 press conference. The reason for revoking Kelly's press credentials was a pretext, as the accusation was false and concocted entirely to provide a false basis to revoke Kelly's press credentials. Kelly had videotaped the entire July 19, 2022

episode and he had not bumped or otherwise come into contact with any of Lightfoot's security force.

Since receiving Brown's letter, Kelly has been blocked participating in any of Lightfoot's press conferences. This significantly hampers her ability to do her job as a reporter covering the most important stories and events happening in Chicago Illinois right now. Most importantly because Kelly cannot do his job the public is deprived of the answers to the tough but fair questions that only Kelly has been pressing.

## STANDARD OF REVIEW

The U.S. Court of Appeals for the Seventh Circuit has set up a two-stage test for the issuance of a temporary restraining order or preliminary injunction. *Merritte v. Kessel*, 561 F. App'x 546, 548 (7th Cir. 2014) (standards of proof for TRO or PI the same). First, the movant must show (1) irreparable harm in the period before resolution on the merits; (2) traditional legal remedies are inadequate, and (3) there is at least some likelihood of success on the merits. *HH-Indianapolis, LLC v. Consol. City of Indianapolis*, 889 F.3d 432, 437 (7th Cir. 2018). If a party meets these thresholds, the court moves to "weigh the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." *Id.* Considering these three factors, this Court should conclude that Kelly has made the requisite showings, and that the balance of harms favors their request.

When a party seeks a preliminary injunction to prevent a First Amendment violation, the primary focus is on the likelihood of success on the merits. As to the first and second factors, "The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate, and injunctions protecting First Amendment freedoms are always in the

[6]

public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). Finally, as to the weighing of interests, if Kelly shows his likelihood of success on the merits, the Defendants have little interest in enforcing a decision that is likely unconstitutional. *Planned Parenthood of Ind. & Ky., Inc. v. Adams*, 937 F.3d 973, 991 (7th Cir. 2019).

## ARGUMENT

The Court should issue a preliminary injunction enjoining the Defendants from continuing to retaliate against Kelly by excluding him from equal press access. Kelly is suffering irreparable harm without an injunction because he is denied equal access to press conferences, traditional legal remedies are inadequate to resolve this harm, and they are likely to succeed on the merits of their constitutional claims.

### I. Kelly suffers irreparable harm by being excluded from the Lightfoot's press conferences, and traditional legal remedies are inadequate

News is an inherently time-bound business. When reporters are prevented from reporting the news, "each passing day may constitute a separate and cognizable infringement of the First Amendment." *CBS v. Davis*, 510 U.S. 1315, 1317 (1994) (Blackmun, J., in chambers). A reporter and outlet's timely access to news is essential because "the newsworthiness of a particular story is often fleeting. To delay or postpone . . . undermines the benefit of public scrutiny and may have the same result as complete suppression." *Grove Fresh Distribs. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994).

Kelly suffers irreparable harm every day that he is barred from Lightfoot's press conferences. It is the bread-and-butter of reporting for journalists to cover these events and to ask questions about the news, and then to share that news through their outlet. "A person singled out for exclusion … is placed at an extraordinary disadvantage in his or her attempt to compete in the 'marketplace of ideas.'" *Huminski v. Corsones*, 386 F.3d 116, 146 (2d Cir. 2004). Though he

[7]

continues to work hard and regularly breaks other stories, Kelly cannot press the important questions for the news outlets he serves, and which many other news outlets find worthy of coverage.

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of the issuance of preliminary relief. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Moreover, traditional legal remedies are inadequate — there is no way to later make whole the lost opportunity to exercise First Amendment freedoms or to cover important news conferences or press events. *See Christian Legal Soc'y*, 453 F.3d at 859.

## II. Plaintiffs are likely to succeed on the merits of their constitutional claims.

Kelly is likely to succeed on the merits of his First and Fourteenth Amendment claims. At a minimum, they pass the "low threshold" that their claims have a "better than negligible" chance of success. *HH-Indianapolis, LLC*, 889 F.3d at 437.

### a. Kelly is likely to succeed on his First Amendment claim against Defendants for violating their right to equal access to information and events. (Count I)

The First Amendment's freedom of the press clause includes a right of equal access for all journalists and the outlets they represent to information or events made generally available to the press corps. *Am. Broad. Cos.*, 570 F.2d at 1083 ("once there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media"); *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir. 1986); *Sherrill v. Knight*, 569 F.2d 124, 129-30 (D.C. Cir. 1977). *See Courthouse News v. Planet*, 947 F.3d 581, 595 n.8 (9th Cir. 2020).

This is an important First Amendment right which is protected by strict scrutiny. *Sherrill*, 569 F.2d at 130 ("such refusal must be based on a compelling governmental interest."); *United*

[8]

*Teachers of Dade v. Stierheim*, 213 F. Supp. 2d 1368, 1375 (S.D. Fla. 2002) (same); *Times-Picayune Pub. Corp. v. Lee*, Civil Action No. 88-1325, 1988 U.S. Dist. LEXIS 3506, at *25 (E.D. La. Apr. 15, 1988) (same); *Borreca v. Fasi*, 369 F. Supp. 906, 909 (D. Haw. 1974) (same). *See United States v. Connolly*, 204 F. Supp. 2d 138, 139 (D. Mass. 2002) ("[O]nly in the most extraordinary circumstances is the government permitted, consistent with the First Amendment, to discriminate between members of the press in granting access . . .").

In this instance, Kelly has been denied the equal access guaranteed by the First Amendment. He is prevented from participating in the Lightfoot's press conferences on the same basis as all his colleagues in the press corps.

Moreover, Lightfoot can present no compelling interest at stake in such a denial. Kelly presents no security threat to Lightfoot. *See Sherrill*, 569 F.2d at 130. (With Lightfoot's massive security force, larger than those provide to many heads of state, US Senators, and Supreme Court Justices any claim that Kelly is a threat to Lightfoot's physical safety is absurd.) Nor is this an instance where there are simply a limited number of seats for the press on such as on Air Force One. *See Frank v. Herter*, 269 F.2d 245, 248-49 (1959) (Burger, J., concurring); *Getty Images News Servs. v. DOD*, 193 F. Supp. 2d 112, 120 (D.D.C. 2002). It is obvious that there is no reason besides Kelly's questions, viewpoint, the content of his speech, and his reporting that could be used as a basis for his exclusion.

Nor is Kelly seeking special treatment. He acknowledges the First Amendment contains no right to an off-the-record tidbit or an exclusive interview. *See Balt. Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006); *Youngstown Publ'g Co. v. McKelvey*, No. 4:05 CV 00625, 2005 U.S. Dist. LEXIS 9476, at *17-18 (N.D. Ohio May 16, 2005). But that is not the type of access Plaintiffs seek here. Instead, he only wants the same access that all members of the press corps

receive to cover the Lightfoot's events. On that, he has a compelling claim worthy of vindication.

### b. Kelly is likely to succeed on his First Amendment claim against Defendants for discriminating against him based on his viewpoint. (Count II)

The First Amendment's freedom of speech clause prohibits government from discriminating among citizens based on viewpoint. *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 394 (1993) ("The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."). This prohibition on viewpoint discrimination extends to denying press access based on a reporter's content or viewpoint. *Sherrill*, 569 F.2d at 129 ("arbitrary or content-based criteria for press pass issuance are prohibited under the first amendment"). *See McBride v. Vill. of Michiana*, 100 F.3d 457, 461-62 (6th Cir. 1996) (retaliating against a reporter because of the stories she reports by barring her from equal access violates the First Amendment); *Quad-City Cmty. News Serv., Inc. v. Jebens*, 334 F. Supp. 8, 13 (S.D. Iowa 1971).

"A discrimination against a news organization based upon the perceived inaccuracy or bias of its news coverage is a content-based discrimination…Especially is this so when the governmental official enforcing the discrimination is himself the subject of the news reporting. In such circumstances, the official's discriminatory actions seek to promote an interest with which the government may not concern itself at all - control by an official of what is said and written about him." *Times-Picayune Pub. Corp. v. Lee*, Civil Action No. 88-1325, 1988 U.S. Dist. LEXIS 3506, at *25-26 (E.D. La. Apr. 15, 1988). *Accord United Teachers of Dade,* 213 F. Supp. 2d at 1373; *Consumers Union of United States, Inc. v. Periodical Correspondents' Assoc.*, 365 F. Supp. 18, 22-23 (D.D.C. 1973), *rev'd on other grounds*, 515 F.2d 1341 (D.C. Cir. 1975) ("A free press is undermined if the access of certain reporters to facts relating to the public's business is limited merely because they advocate a particular viewpoint.").

This is just what has happened here. Kelly was consistently asking hard questions about Lightfoot's policies that made the Lightfoot uncomfortable during her press conferences. So first he was denied access to a press conference based on a concocted issue with his press credentials. Then, a few days later Kelly's press credentials were revoked, and he was blocked then permanently barred from attending press conferences or asking Lightfoot any questions.

The government has no interest in ensuring only "impartial" news media can cover public affairs. In fact, quite the opposite: the First Amendment protects a strong, independent press corps that embraces a wide variety of viewpoints. This stems from our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)

Any attempt by the government to ensure "impartial" news media inevitably results in viewpoint discrimination. When government officials get in the business of deciding for themselves which news outlets are "impartial" in their coverage of those officials, they are making impermissible judgment calls about each journalist's reporting and viewpoint. And those journalists whose viewpoint they don't like, that often file stories or ask questions that are considered critical, or who engage in investigative reporting of an incumbent's administration that uncovers embarrassing facts — those journalists are deemed "unfair" and "biased" and thus denied press access. This case is a government official picking winners and losers among the press corps based on the content of their questions.

This sort of picking-and-choosing who is "fair" or "impartial" is unconstitutional: "Requiring a newspaper's reporter to pass a subjective compatibility-accuracy test as a condition precedent to the right of that reporter to gather news is no different in kind from requiring a

[11]

newspaper to submit its proposed news stories for editing as a condition precedent to the right of that newspaper to have a reporter cover the news. Each is a form of censorship." *Borreca*, 369 F. Supp. at 909-10 (finding against a mayor who excluded a particular reporter from press conferences). *Borreca* continued, "[a] free press is not necessarily an angelic press. Newspapers take sides, especially in political contests. Newspaper reporters are not always accurate and objective." *Id*. at 910. The appropriate response, however, is for the government official to dispute or criticize the reporting. But the government official crosses a line "when criticism transforms into an attempt to use the powers of governmental office to intimidate or to discipline the press or one of its members. . ." *Id*. That is the line Lightfoot has crossed in this case.

### c. Kelly is likely to succeed on his Fourteenth Amendment claim against Defendants for violating his right to equal protection of the laws. (Count III)

The Fourteenth Amendment guarantees all citizens equal protection of the laws against arbitrary or unfair enforcement by state governments. It is a violation of that protection for the government to grant access to one news organization and deny it to another. *McCoy v. Providence Journal Co.*, 190 F.2d 760, 766 (1st Cir. 1951); *Westinghouse Broad. Co. v. Dukakis*, 409 F. Supp. 895, 897 (D. Mass. 1976) (same). *See Capital Cities Media, Inc. v. Chester,* 797 F.2d 1164, 1176 (3d Cir. 1986) (en banc) (similar). Here again the government must show a compelling interest to justify its classification. *Quad-City Cmty. News Serv., Inc.*, 334 F. Supp. at 15. Again, the Lightfoot cannot meet this standard — there is no compelling interest which justifies his decision to exclude Kelly while permitting access to all others.

### d. Kelly is likely to succeed on his Fourteenth Amendment claim against Defendants for violating their right to due process of the laws. (Count IV)

Access to the press corps is a First Amendment liberty interest that once granted cannot be revoked without due process of law. *Sherrill*, 569 F.2d at 130-31 ("This first amendment

interest undoubtedly qualifies as liberty which may not be denied without due process of law."). *Accord Karem*, 404 F. Supp. 3d 203 (applying *Sherrill's* due-process holdings).

To comport with due process, a government official must first publicize "the actual standards employed in determining whether an otherwise eligible journalist [would] obtain a White House press pass" so judges, journalists, and the public can determine whether an appropriate denial has been made. *Id*. at 130. *See id*. at 131 ("articulate and publish an explicit and meaningful standard governing denial of White House press passes"). *Accord Getty Images News Servs.*, 193 F. Supp. 2d at 121 (same); *Quad-City Community News Service, Inc.*, 334 F. Supp. at 17 (same). This is the vagueness component of *Sherrill's* holding.

Second, when an official believes that standard has been violated, he must provide the journalist "notice of the factual bases for denial, an opportunity for the applicant to respond to these, and a final written statement of the reasons for denial." *Sherrill,* 569 F.2d at 130. This is the procedural due-process component of *Sherrill's* holding.

The Defendants failed in both respects here. At no time has the Lightfoot's Office circulated to Kelly or the press any policy or professional standard by which it expects members of the press corps to behave to retain their access. Second, when she chose to revoke Kelly's access the Lightfoot instructed Brown to issue a simple letter edict with no invitation to respond or to seek review. In other words, the Lightfoot's decision failed both prongs of due process to which Kelly was entitled.

### III. Kelly and the public will suffer substantial harm without temporary and preliminary relief unlike the Defendants who will suffer only minor inconvenience if any

The balance of harms favors the Plaintiff. First, the harm to Plaintiff is substantial:

> Certainly, the exclusion of particular reporters from the news presented each morning at on-the-record press conferences, which hundreds of other reporters are eligible to attend, affects the content and quality of the news that is reported as

[13]

well as access to the sources of news. Moreover, it is important to recognize that this is not a single, sporadic refusal of access. Exclusion from the press galleries constitutes a permanent disadvantage with regard to the gathering of news and has a significant impact when measured in terms of the First Amendment, both upon the publication excluded and others in similar situations. *Consumers Union of United States, Inc.*, 365 F. Supp. at 26.

Second, the exclusion harms not only Kelly but the public at large as well. "Exclusion of an individual reporter also carries with it the danger that granting favorable treatment to certain members of the media allows the government to influence the type of substantive media coverage that public events will receive, which effectively harms the public." *Huminski*, 386 F.3d at 147. Here, "the public interest will be well served by [injunctive] relief." *United Teachers of Dade*, 213 F. Supp. 2d at 1376.

Moreover, considering the effect on the other side, the Lightfoot will suffer no harm, "merely involve some minor inconvenience to the [Lightfoot's] press staff." *Cable News Network, Inc. v. Am. Broad. Cos.*, 518 F. Supp. 1238, 1246 (N.D. Ga. 1981) (granting a preliminary injunction to CNN ordering the White House to include television reporters in the regular press pool for limited-access presidential events on the same basis as print reporters). The inclusion of Kelly requires nothing more than restoring a single name to the press list; there is no harm to the Lightfoot; only the slightest inconvenience to staff.

## CONCLUSION

As all the factors are met, Plaintiff respectfully request that their motion for a Temporary Restraining Order be granted then to be followed by a granting the Plaintiff a Preliminary Injunction be granted.

                                                Respectfully Submitted

                                                /s/ Laura Grochocki
                                                Attorney for William Kelly

Laura Grochocki
Attorney for William Kelly
200 East Illinois Street, 3211
Chicago, Illinois 60611
312-620-0671
lauraglaw@aol.com
Attorney No. 6239444

[15]