UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM J. KELLY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 22-cv-4533 |
| | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | |
| LORI LIGHTFOOT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff William J. Kelly brings this motion for a temporary restraining order ("TRO") under Federal Rule of Civil Procedure 65 against defendants Chicago Mayor Lori Lightfoot and Chicago Superintendent of Police David Brown in relation to the August 8, 2022 revocation of his press credentials under the Chicago Police Department's ("CPD") General Order G-09-01-01. Kelly seeks to enjoin defendants from excluding him from the mayor's press conferences and requests that his press credentials be reinstated based on defendants' alleged violations of his First and Fourteenth Amendment rights. The Court, in its discretion, denies Kelly's motion for a TRO.

**Background**

Kelly alleges he is a nationally known journalist and that defendants violated his First Amendment and Fourteenth Amendment rights when they revoked his press credentials under false pretenses. He specifically alleges that as a reporter, he regularly attends Mayor Lightfoot's press conferences and asks hard questions about violent crimes in Chicago. Kelly maintains that in his role as a reporter and journalist, he has caused Mayor Lightfoot great embarrassment by asking these hard questions. Further, Kelly alleges Superintendent Brown, following Mayor Lightfoot's instructions, directed a Chicago Police Officer to fabricate a police report as pretext to revoke his press credentials.

In response, defendants have presented evidence that on August 10, 2022, the City contacted Kelly's attorney via email to let him know Kelly's media credentials had been revoked. In that correspondence, the City explained that if Kelly wanted new credentials or to seek rescission or reconsideration of the decision, he could submit a letter to the Superintendent setting forth grounds why the decision should be rescinded or reconsidered under CPD Special Order S09-02-01.

Kelly did not follow this procedure, but instead filed the present lawsuit and TRO on August 25, 2022. He served defendants on August 29, 2022. As the emergency judge, the Court heard oral arguments on the TRO on August 31, 2022.

**Legal Standard**

The standards for the issuance of TROs and preliminary injunctions are the same. *Cassell v. Snyders*, 458 F.Supp.3d 981, 990 (N.D. Ill. 2020) (Lee, J.). Both are "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020) (citation omitted). A party seeking a TRO must first demonstrate: (1) the likelihood of success on the merits; (2) there is no adequate remedy at law; and (3) irreparable harm is likely in the absence of the temporary restraining order. *See Winter v. Natural Res. Defense Council, Inc.,* 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *Cassell v. Snyders*, 990 F.3d 539, 544-45 (7th Cir. 2021). If the moving party fails to demonstrate any one of these three threshold requirements, the Court must deny the motion. *See Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). If the moving party makes this threshold showing, the Court then balances the harms between the parties and the effect on the public interest. *Tully v. Okeson*, 977 F.3d 608, 613 (7th Cir. 2020). The Court has considerable discretion in determining TRO motions. *Cassell*, 990 F.3d at 545.

**Discussion**

The Court turns to the likelihood of success on the merits factor because it is dispositive. Under controlling Seventh Circuit case law, a mere possibility of success, also known as the "better

than negligible" standard, will not suffice. *See Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). Rather, Kelly must make a strong showing that he is likely to succeed on the merits. *See Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020). In assessing the merits, courts do not accept the movant's allegations as true, construe all reasonable inferences in his favor, nor give him the benefit of conflicting evidence. *See Doe v. University of Southern Ind.*, 43 F.4th 784, 791-92 (7th Cir. 2022). Instead, courts "approach the record from a neutral and objective viewpoint, assessing the merits as [the courts] think they are likely to be decided after more complete discovery and litigation." *Id.* at 792. In assessing the merits, the Court need not credit a party's "speculative and factually unsupported hypotheses." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 542 (7th Cir. 2021).

In Count I of his complaint, Kelly alleges that by excluding him from the mayor's press conferences, defendants have violated his First Amendment right to freedom of the press. "The importance of a free press to our founders was memorialized in the First Amendment which prohibits the government from abridging the freedom of press, which now, of course, encompasses all forms of media." *John K. MacIver Inst. for Public Policy, Inc. v. Evers*, 994 F.3d 602, 605 (7th Cir. 2021). "Like all rights enumerated in the Bill of Rights, however, it is not absolute." *Id.*

"The amount of access to which the government must give the public for First Amendment activities, and the standards by which a court will evaluate limitations on those rights, depends on the nature of the forum at issue." *Id.* at 609. "Streets, sidewalks and parks, and the quintessential soap box in the public square fall on one end of the spectrum," namely, "the traditional public fora." *Id.*; *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Meanwhile, a designated public forum is public property that the government has opened to members of the public to use as a place for expressive activity. *Evers*, 994 F.3d at 609. The third category involves non-public fora, "where the government controls public property which

is not, by tradition or designation, a forum for public communication and is open only for selective access." *Id.*

Kelly attaches the CPD's General Order G-09-01-01 to his complaint. This General Order, entitled "News Media Credentials," informs CPD "members of the conditions for the use and revocation of news media credentials issued by the Office of News Affairs." Based on this General Order, Mayor Lightfoot's press conferences fall under the non-public category described above because the forum is open only for selective access. *See Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,* 473 U.S. 788, 804-06, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Put differently, the mayor's press conferences are open to journalists who meet certain criteria. *See Evers*, 994 F.3d at 610.

"The rules governing public and nonpublic forums strike a balance between the interest in free speech and the countervailing interest in the efficient operation of government. In the traditional public forum the first interest is paramount, and in the nonpublic forum the second." *May v. Evansville-Vanderburgh Sch. Corp.,* 787 F.2d 1105, 1114 (7th Cir. 1986). When "the State establishes a limited public forum, the State is not required to and does not allow persons to engage in every type of speech." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). Also, in the context of limited public fora, "the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n*, 460 U.S. at 46; *see also Cornelius,* 473 U.S. at 806 ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.").

Based on an August 5, 2022 police report and August 8, 2022 letter to Kelly from Superintendent Brown, defendants explain that they revoked Kelly's media credentials because at the end of a July 19, 2022 press conference, Kelly became aggressive and yelled at the mayor to answer

4

his questions. At that time, the mayor was walking away from the press conference when Kelly aggressively walked towards her while shouting. The mayor's security detail then positioned themselves in front of Kelly. Defendants revoked Kelly's media credentials based on his abusive conduct, including his irate and aggressive behavior, not just his physical contact with the mayor's security detail as Kelly suggests. In response to this evidence, Kelly has submitted a video of his encounter with Mayor Lightfoot's security detail. Not only is the video blurry and unfocused, there is no indication that the video captured the entire incident. In short, the video does not refute defendants' reason for revoking Kelly's media credentials.

Kelly also argues defendants revoked his media credentials based on his viewpoint because he has repeatedly questioned the mayor about violent crime in Chicago and that these questions embarrassed her. Kelly supports his argument with speculation and unreasonable inferences. *See Life Spine, Inc.*, 8 F.4th at 542. More specifically, there is no evidence in the record to support Kelly's hypothesis that the mayor instructed the superintendent of police to revoke his media credentials, let alone that she did so based on Kelly's viewpoint. In the end, Kelly has not made a strong showing that he will likely succeed on the merits of his First Amendment freedom of press claim.

In Count II, Kelly asserts defendants violated his First Amendment right to free speech by retaliating against him based on the content of his speech. *See Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) ("[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015). Kelly's content-based argument is the same as his viewpoint argument—the mayor revoked his press credentials based on his repeated questions about crime in Chicago and the mayor's embarrassment about these questions. As discussed, Kelly did not

5

substantiate his viewpoint argument with sufficient factual support. Accordingly, Kelly has not made a strong showing that he will likely succeed on the merits of his First Amendment speech claim.

Turning to Kelly's Fourteenth Amendment equal protection claim as alleged in Count III, he contends defendants denied him equal access by revoking his press credentials. Kelly's equal protection claim rests on his assertion that the First Amendment guarantees equal access to members of the media. As the *Evers* decision explains, plaintiff's "argument that the First Amendment provides a guarantee of 'equal access' among members of the media rests on cases that pre-date modern forum analysis or cases with such unique facts as to have no relevance here." *Id.* at 612. Interestingly enough, Kelly relies on one of these outdated cases. *See id.* at 613 ("*Sherrill v. Knight*, also predates modern forum analysis."). Again, Kelly has not made a strong showing that he is likely to succeed on his equal protection claim because he bases his claim on outdated precedent.

In Count IV, Kelly relies on *Sherill v. Knight* asserting he has a First Amendment liberty interest in his press credentials and that defendants denied him procedural due process under the Fourteenth Amendment when they revoked his credentials. *See Sherrill v. Knight*, 569 F.2d 124, 130 (D.C. Cir. 1977). In *Sherrill*, the D.C. Circuit concluded that White House reporters had First Amendment liberty interests in White House press passes. *See id.* Kelly does not point to a Seventh Circuit decision adopting the holding in *Sherrill*, nor could the Court locate any such decision. Kelly ignores the Seventh Circuit's reliance on later Supreme Court decisions that established the modern forum doctrine, namely, *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), and *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). *See Evers*, 994 F.3d at 609. Meanwhile, without a liberty interest (or property interest), Kelly's due process claim fails. *See Citizens Health Corp. v. Sebelius,* 725 F.3d 687, 694 (7th Cir. 2013) ("the threshold question in any due process challenge is whether a protected

property or liberty interest actually exists."). As such, Kelly has not established a likelihood of success on the merits in relation to his due process claim.

On a final note, Kelly states he is bringing this TRO to preserve the status quo. Here, the status quo is that Kelly's press credentials have been revoked and he cannot attend the mayor's press conferences. Under the circumstances, he is seeking an affirmative mandate requiring an affirmative act by defendants to reinstate his credentials and enjoin the mayor and superintendent from stopping him from asking questions. Because courts cautiously view and sparingly issue mandatory injunctive relief, granting Kelly's TRO is not appropriate at this time. *See Mays,* 974 F.3d at 818.

**Conclusion**

For these reasons, the Court, in its discretion, denies plaintiff's motion for a temporary restraining order [2].

IT IS SO ORDERED.

Date: 9/2/2022

Entered:

_____
SHARON JOHNSON COLEMAN
United States District Judge